IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAELIA WINDER | : | CIVIL ACTION |
| | : | NO. 18-cv-04016 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TRICOUNTY MEDICAL EQUIPMENT and | : | |
| QMES, LLC, | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

Eduardo C. Robreno, J.                                    July 23, 2020

I. Introduction

    Presently before the Court is the motion for summary
judgment of Defendants TriCounty Medical Equipment and
Adapthealth, LLC, f/k/a QMES, LLC, (collectively, "Defendant").
For the reasons set forth below, the Court will grant in part
and deny in part Defendant's motion.

II.  Factual Background and Procedural History[1]

    Plaintiff Michaelia Winder ("Plaintiff") is an African-
American female and former employee of Defendant. She resides in
Pennsylvania.

    In March of 2017, Defendant hired Plaintiff as a customer
service representative. At the time of her hiring, Plaintiff was

---

[1]    At the summary judgment stage, the evidence produced by Plaintiff is
viewed in the light most favorable to Plaintiff, drawing all reasonable
inferences in her favor.

five months pregnant. She disclosed her pregnancy to Defendant during her employee orientation. Plaintiff began her 8-week maternity leave in late July of 2017 before giving birth on August 1, 2017.

Upon her return to work on September 25, 2017, Plaintiff informed her supervisors, Bonnie Moatz, Amanda Dero, and Dorothy Exline, that she needed a private room to pump breast milk for her newborn child. Plaintiff testified that she biologically needed to pump for about 30-45 minutes approximately four times per day. Winder Dep. at 23:3-24, 24:1-7. At that time, another employee, a Caucasian woman named Shallyn Lacey, also needed to pump. Ms. Lacey only biologically needed to pump once per day, for approximately 45 minutes. Exline Dep. at 42:4-14.; see also Brown Dep. at 31:19-24, 32:1-5.

Defendant initially provided Plaintiff access to a private CPAP[2] fitting room in order to pump as much as she biologically needed to. At some point thereafter, the designated pumping room was moved to a private meeting room. Employees, including Plaintiff and Ms. Lacey, could reserve the meeting room through an electronic scheduling program. Ms. Moatz informed Plaintiff that nursing mothers would have priority access to the room

---

[2]     Continuous Positive Airway Pressure. The CPAP fitting room was originally used to fit customers with CPAP machines.

On a number of occasions, Plaintiff was unable to reserve the room through the electronic system because it was already reserved for a block of time.[3] In such instances, Plaintiff complained to her supervisors, including Ms. Exline and Ms. Moatz, that she was unable to reserve the room because it had already been booked. According to Plaintiff, she was told "[u]ltimately, that [she] should use the closet or bathroom" to pump. Winder Dep. at 31:19-20. As a result of the room being unavailable to Plaintiff, she had to pump in Ms. Lacey's car on one occasion. On another occasion, Plaintiff's lack of access to the room resulted in her leaking breast milk through her shirt and soiling it.

Some time later, Plaintiff was told by Ms. Exline that she could not pump as often as biologically necessary without it affecting her pay. Ms. Exline informed Plaintiff that if she needed to pump for more than the standard break time afforded to all employees (a thirty-minute lunch and two fifteen-minute breaks), she would need to clock out and would not be paid. See Pl.'s Opp. at 7, ECF No. 46. Plaintiff was only allowed to pump during the scheduled lunch time and scheduled morning and afternoon break times. See Winder Dep. at 71-72. By contrast,

---

[3]     Plaintiff testified that there were "at least seven times; at most, maybe ten" when the meeting room was already scheduled when Plaintiff attempted to reserve the room in advance. Winder Dep. at 39:11-12.

Ms. Exline blocked off a continuous hour around lunchtime for
Ms. Lacey to pump. Id.

Defendant's employee handbook allowed employees to take
five days of unpaid time off. See Exline Dep. at 61; Ex. Winder-
1, ECf No. 45-3 at 98. Upon the sixth day of unpaid time off, an
employee could be subject to discipline up to and including
termination. See id. In January 2018, Ms. Exline informed all of
her employees that Defendant would begin "cracking down" on
enforcement of the unpaid-time-off policy. See id. at 60:9-11;
63:11-16.

In early January of 2018, Plaintiff received a staff-wide
email stating that, "after five days [of unpaid time off],
[employees] would get a warning; [after] six, [employees] were
terminated automatically." Winder Dep. at 60:20-24, 61:1-5. Two
days prior to her termination, on February 7, 2018, Plaintiff
told Ms. Exline that she would not be available to work on
February 8, 2020. Id. at 52:16-22. At that point, Ms. Exline
told Plaintiff that she could not take February 8 off work
because Plaintiff was "up to [her] limit" of unpaid time off.
Id. Plaintiff did not attend work on February 8. On February 9,
2020, Ms. Exline and Ms. Dero provided Plaintiff with a
Corrective Action Form notifying Plaintiff of her termination
effective that day.

After her termination, Plaintiff initiated the current action, alleging pregnancy-based and race-based discrimination, retaliation, and a hostile work environment.

Following the close of discovery, Defendant filed the motion for summary judgment presently before the Court, Plaintiff filed a response in opposition, and Defendant was granted leave to file a reply. The motion for summary judgment is now ripe for disposition.

III. <u>Legal Standard</u>

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 581 (3d Cir. 2009) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

In ruling on a motion for summary judgment, the Court must consider the evidence in a light most favorable to the nonmoving

party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475
U.S. 574, 587 (1986). While the moving party bears the initial
burden of showing the absence of a genuine issue of material
fact, meeting this obligation shifts the burden to the nonmoving
party who must "set forth specific facts showing that there is a
genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250.

IV.   <u>Discussion</u>

Plaintiff claims pregnancy-based and race-based
discrimination, retaliation, and a hostile work environment, in
violation of Title VII, the Pregnancy Discrimination Act, and
the Pennsylvania Human Rights Act.[4]

A. Discrimination

Title VII of the Civil Rights Act of 1964 forbids a covered
employer to "discriminate against any individual with respect to
. . . terms, conditions, or privileges of employment, because of
such individual's race, color, sex, or national origin." 42
U.S.C. § 2000e-2. The Pregnancy Discrimination Act
"specifies that Title VII's 'ter[m] "because of sex" . . .
include[s] . . . because of or on the basis of pregnancy,
childbirth, or related medical conditions.'" <u>Young v. United</u>

---

[4]   Because claims under Title VII and the Pennsylvania Human Rights Act
are largely analyzed under the same framework, subject to a few exceptions
that do not apply here, the Court will analyze Plaintiff's claims
coextensively. <u>See</u> <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 409 (3d Cir.
1999); <u>Tourtellotte v. Eli Lilly & Co.</u>, 636 F. App'x 831, 852 (3d Cir. 2016)
(nonprecedential).

Parcel Serv., Inc., 575 U.S. 206, 135 S. Ct. 1338, 1345 (2015)
(alterations in original) (quoting 42 U.S.C. § 2000e(k)). "[T]he
Third Circuit has not expressly resolved whether 'a complaint
based [solely] on the need to express breast milk is cognizable
under Title VII.'" Mercado v. Sugarhouse HSP Gaming, L.P., No.
18-3641, 2019 WL 3318355, at *5 (E.D. Pa. July 23, 2019) (second
alteration in original) (quoting Page v. Trs. of Univ. of Pa.,
222 F. App'x 144, 145 (3d Cir. 2007) (nonprecedential)).
However, other courts have found that the need to express breast
milk is covered by Title VII because "'lactation is a normal
aspect of female physiology that is initiated by pregnancy and
concludes sometime thereafter,' and thus is a 'medical
condition[ ]' 'related' to pregnancy within the meaning of the
[Pregnancy Discrimination Act]." Id. (quoting E.E.O.C. v.
Houston Funding II, Ltd., 717 F.3d 425, 428 (5th Cir. 2013)).

Plaintiff concedes that her case presents only
circumstantial evidence; therefore, to establish her prima facie
case of discrimination she must show that: (1) Plaintiff is a
member of a protected class; (2) she was qualified for the
position in question; (3) she suffered an "adverse employment
action"; and (4) that she suffered the adverse employment action
under circumstances that give rise to an inference of unlawful
discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403,
410-11 (3d Cir. 1999); see also Tourtellotte v. Eli Lilly & Co.,

636 F. App'x 831, 842 (3d Cir. 2016) (nonprecedential).

Additionally, to establish a prima facie case of pregnancy-based discrimination, Plaintiff must show (5) that "she is or was pregnant and that her employer knew she was pregnant." Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 365 (3d Cir. 2008). A plaintiff may show an inference of unlawful discrimination through comparator evidence—that is, "by showing that similarly situated individuals outside the plaintiff's class were treated more favorably [than the plaintiff]." Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 273-74 (3d Cir. 2010).

If Plaintiff succeeds in making out a prima facie case, then, under the familiar McDonnell-Douglas framework, the burden of production shifts to the Defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If Defendant states such a reason, the presumption of discrimination raised by the prima facie case is rebutted, and the Plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Jones, 198 F.3d at 410.

To show pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder

could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

    i. Prima Facie Case

At this stage of the proceedings, Plaintiff has shown that she is a member of a protected class (as an African-American female), that her employer knew of her pregnancy, that she is qualified for the position (she had received positive recognition for her job performance), and that she suffered an adverse employment action (termination). Therefore, whether Plaintiff has established a prima facie case turns on whether her termination gives rise to an inference of unlawful discrimination.

Plaintiff points to several instances which she alleges show that Ms. Exline's decision to terminate her gives rise to an inference of both racial and pregnancy discrimination.

As to pregnancy-based discrimination, Plaintiff alleges that Ms. Exline suggested that she would not have hired Plaintiff had she known Plaintiff was pregnant. In support of this, Plaintiff points to the deposition of her coworker, Ms. Brown, regarding a conversation between Ms. Brown and Ms. Exline

shortly after Plaintiff was hired. According to Ms. Brown, after
Plaintiff showed up for employee orientation visibly pregnant,
Ms. Brown asked Ms. Exline, "[W]hy would you hire a pregnant
person knowing that she's going to have to leave within a
certain amount of time, and then we're going to be short staffed
again for a few months." Brown Dep. at 26:1-6. Ms. Exline
responded, "I didn't know she was pregnant when I hired her."
Id. at 26:6-7. In the light most favorable to Plaintiff, Ms.
Exline's remark may be construed to mean that Ms. Exline held a
hostile attitude towards pregnant women.

Plaintiff also points to inconsistent statements by her
supervisor, Ms. Exline, and a senior official of Defendant, Neil
Halberstadt, Vice President of Customer Service, concerning
Defendant's policy as to the availability of pumping rooms and
the time allowed for pumping breast milk.

Mr. Halberstadt testified that he would not have "approved"
Ms. Exline docking an employee's pay if the employee needed to
pump breast milk for more than the standard breaktime.
Halberstadt Dep. at 68:8-18 ("I think just from a human
standpoint if the necessity to pump took longer than the
allotted 15 minutes, it's not controllable."); Id. at 67:15-16
("They would not have to clock out, is what I gather.").

To the contrary, Plaintiff testified that she repeatedly
did not receive access to a private room for pumping breast milk

and that when she reported the issue to Ms. Exline, she was "informed that she should 'use the closet or the bathroom.'" Pl.'s Opp. at 5, ECF No. 46. According to Plaintiff, and contrary to Mr. Halberstadt's testimony, Ms. Exline informed her that if Plaintiff needed to pump more than one hour a day, Plaintiff's pay would be docked. See Id. at 7.

As to racial discrimination, Plaintiff points to the treatment of Ms. Lacey, who is Caucasian and also needed to pump breast milk. Ms. Lacey also worked in customer service, was supervised by Ms. Exline, and was subject to the same attendance policy. See Winder Dep. at 20:15-17; Moatz Dep. at 36-37; Exline Dep. at 67:16-19. Plaintiff contends that Ms. Lacey was similarly situated to Plaintiff but was not terminated despite Defendant acknowledging that Ms. Lacey's performance suffered from similar behavior to Plaintiff's. Plaintiff points to testimony of Mr. Halberstadt that Ms. Lacey had "attendance issues, productivity issues, [and an] overall lack of work ethic." Halberstadt Dep. at 37:20-21.

Accordingly, the Court finds that, in the light most favorable to Plaintiff, she has presented sufficient evidence to permit an inference that Plaintiff's termination was the result of unlawful pregnancy and racial discrimination.[5]

---

[5]    Plaintiff's brief in opposition also argues that "Ms. Exline even went so far as to refer to the Plaintiff, and the other African-American women in the building with the racially charged epithet as [sic] 'sistahs', with an

ii.  Defendant's Reasons for Termination

Plaintiff, having satisfied the elements of her prima facie case, the burden of production shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. Defendant points to Plaintiff's excessive absences as a legitimate, nondiscriminatory reason for Plaintiff's termination. These absences violated company policy and therefore constituted a valid reason for termination. Therefore, Defendant has satisfied the burden of production.

iii. Pretext

Plaintiff does not challenge the number of days of work she was absent. Therefore, Plaintiff's pretext argument requires that she show an invidious discriminatory reason was more likely than not a motivating or determinative cause of her termination. See Fuentes, 32 F.3d at 764.

"In order to avoid summary judgment, Fuentes requires a plaintiff to put forward 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir.

_____

emphasis on the 'a-h'." Pl.'s Opp. at 7, ECF No. 46. However, the record shows that a woman named Carolyn [or perhaps Carol], not Ms. Exline, used the term. See Winder Dep. at 45-47; see also Brown Dep. at 77:17-24, 78:1-14. Nor is there any evidence that Carolyn held any supervisory role in respect to Plaintiff.

2005) (quoting <u>Fuentes</u>, 32 F.3d at 765); <u>see also</u> <u>Simpson v. Kay</u>
<u>Jewelers, Div. of Sterling, Inc.</u>, 142 F.3d 639, 645 (3d Cir.
1998) (comparator evidence may show pretext); <u>Wilcher v.</u>
<u>Postmaster Gen.</u>, 441 F. App'x 879, 881 (3d Cir. 2011)
(nonprecedential) ("To establish a pretext for discrimination,
Wilcher may 'show that the [USPS] has previously discriminated
against [him], that the [USPS] has discriminated against other
persons within [his] protected class or within another protected
class, or that the [USPS] has treated more favorably similarly
situated persons not within the protected class.'"(alterations
in original) (quoting <u>Simpson</u>, 142 F.3d at 645)).

Plaintiff argues that there are three bases upon which a
reasonable jury could find Defendant's proffered reason for
terminating Plaintiff (number of absences) unworthy of credence.
To wit:

One, a reasonable jury could find that Ms. Exline's stated
reason set out in the Corrective Action Form dated February 9,
2018, which Ms. Exline prepared and gave to Plaintiff as
official notice of Plaintiff's termination following her absence
from work on February 8, 2018, <u>see</u> Ex. Winder-1, ECF No. 45-3 at
98, was inconsistent with Ms. Exline's prior representations
concerning the application of the company's unpaid-time-off
policy's five-day limit.

Pursuant to Defendant's written "Companywide – Unpaid Time Off" policy, employees were "allowed a maximum of 5 unpaid days off in an anniversary work year." Ex. Winder-3, ECF No. 45-3 at 102. The policy defines an anniversary work year as "the yearly time period from [an employee's] initial hire date, and each recurring year thereafter)." Id. According to this unpaid-time-off policy, after an employee's fifth unpaid day off within an anniversary work year, "additional time off . . . w[ould] be handled through disciplinary action. Continued abuse of unpaid time off may lead to further disciplinary action up to and including termination." Id.

Prior to 2018, Defendants were not enforcing the written unpaid-time-off policy's five-day limit. See Exline Dep. at 63:14-16. In January of 2018, Ms. Exline told employees, including Plaintiff, that she would start enforcing the policy, but that she would exclude any unpaid time off accrued in 2017. See id. at 67:12-24 (Ms. Exline informed by her director to "start adhering" to the policy); id. at 62:15 (Ms. Exline informs employees that, starting January 2018, she would begin "cracking down" on enforcing the policy); id. at 62:14-17 (Ms. Exline would not count time off accrued in 2017). Contrary to this representation, Ms. Exline in fact considered, in the

Corrective Action Form, the 196 hours of unpaid time off accrued by Plaintiff in 2017. <u>See</u> Ex. Winder-1, ECF No. 45-3 at 98.[6]

Two, a reasonable jury could find that Ms. Exline's second stated justification in the Corrective Action Form for terminating Plaintiff—that the February 8, 2018, absence constituted a "no call no show"—is inconsistent with Ms. Exline's later testimony as to both the justification for Plaintiff's ultimate termination as well as to the characterization of Plaintiff's February 8 absence.

In the Corrective Action Form, Ms. Exline justified Plaintiff's termination, at least in part, because Plaintiff's February 8 absence was a "no call no show." <u>Id.</u> Later, Ms. Exline testified that, to the contrary, it was the quantity of Plaintiff's absences for which Ms. Exline terminated Plaintiff. <u>See</u> Exline Dep. at 68:3-23.

---

[6]     According to Ms. Exline's testimony, the 196 hours mentioned in the Corrective Action Form represents the amount of unpaid time off Plaintiff had accrued from March 2017, when she was hired, through December 2017. <u>See</u> Exline Dep. at 62:16-19; <u>see also</u> Ex. Winder-1, ECF No. 45-3 at 98 (mentioning both "196 hours" of unpaid time off and characterizing Plaintiff's request to take off February 9, 2018, as her "6th [day] since January and 30th altogether").

    In addition to the inconsistency between Ms. Exline's reliance on the 196 hours and her earlier representation that 2017 absences would not be counted, a reasonable jury could find that Ms. Exline's statement that she "could not give [Plaintiff] any" more time off because Plaintiff had accrued 196 hours, <u>id.</u>, was inconsistent with Ms. Exline's discretionary authority in enforcing the unpaid-time-off policy. That is, in light of Ms. Exline's authority to forgive 2017 absences notwithstanding the written policy, a reasonable jury could find that Ms. Exline's statement that she "could not approve," Plaintiff's request, <u>id.</u>, lacked credibility. <u>See</u> Exline Dep. 70:7-14.

Further, when asked during deposition if Plaintiff "failed to give any advance warning or notice that she couldn't come in" on February 8, Ms. Exline responded that she "had [a] discussion with [Plaintiff] on the 6th" about Plaintiff's request to take off February 8. Id. at 65:18-24, 65:1-8. A reasonable jury could therefore find Ms. Exline's initial characterization of the February 8 absence as a "no call no show" to be inconsistent with her later testimony that she discussed the absence with Plaintiff beforehand, on February 6.[7]

Three, specifically as far as racial discrimination is concerned, Plaintiff's pretext argument is further supported by evidence that at least one other similarly situated employee was not terminated despite time off violations. Plaintiff points to Mr. Halberstadt's testimony that Ms. Lacey was not terminated despite "attendance issues, productivity issues, [and an] overall lack of work ethic." Halberstadt Dep. at 37:20-21. Although Plaintiff does not allege exactly how many hours of unpaid time off Ms. Lacey had accumulated without termination, Ms. Lacey, who was similarly situated to Plaintiff, was subject to the same time-off policy, was supervised by Ms. Exline, and, according to Mr. Halberstadt's testimony, caused similar

---

[7]     Additionally, the characterization of Plaintiff's February 8, 2020, absence as a "no call no show" contradicts Plaintiff's own testimony that she did inform Ms. Exline in advance that she would not be at work that day due to an inability to secure childcare. See Winder Dep. at 55:12-20. This contradiction raises an issue of fact for the jury.

attendance problems. See Wilcher, 441 F. App'x at 881-82
("Although this court has not explicitly stated what constitutes
a similarly situated employee, . . . . [a] determination of
whether employees are similarly situated takes into account
factors such as the employees' job responsibilities, the
supervisors and decision-makers, and the nature of the
misconduct engaged in." (citations omitted)).[8]

The Court finds that, in regard to both pregnancy
discrimination and racial discrimination, in light of Ms.
Exline's inconsistencies in describing the reasons for
terminating Plaintiff, a reasonable jury could find Defendant's
proffered reasons for Plaintiff's termination unworthy of
credence.[9]

Therefore, the Court will deny Defendant's motion for
summary judgment as to both pregnancy and racial discrimination.

B. Retaliation

Title VII prohibits an employer from "discriminat[ing]
against any of his employees or applicants for employment ...
because he has opposed any practice made an unlawful employment
practice by [Title VII], or because he has made a charge,

---

[8]     Although Plaintiff points to two other employees as being similarly
situated, her brief did not identify who they are, or how, if at all, they
are similarly situated. See Pl.'s Opp., ECF No. 46.
[9]     As to the third reason, the Court notes that the evidence of Ms. Lacey
as an employee similarly situated to Plaintiff adds further, but unnecessary,
support for Plaintiff's pretext argument.

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3.

To establish a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in protected activity; (2) retaliatory action that a reasonable employee would find "materially adverse" in that they "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination"; and (3) a "causal connection" between her participation in the protected activity and the retaliatory act. Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006) (citations omitted). "With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." Id. at 341 (quoting Slagle v. Cty. of Clarion, 435 F.3d 262, 266 (3d Cir. 2006)). An "employee must have an 'objectively reasonable' belief that the activity s/he opposes constitutes unlawful discrimination under Title VII." Wilkerson v. New Media Tech. Charter Sch., 522 F.3d 315, 322 (3d Cir. 2008).

In this case, Plaintiff's brief cites to no complaints she made regarding sex, pregnancy, or racial discrimination. The brief claims that "Plaintiff was terminated as she continually

asked for accommodations, but was provided none." Pl.'s Opp. at 24, ECF No. 46. Plaintiff argues that she complained to Ms. Exline on a number of occasions that the designated pumping room was either already booked or was occupied by another unnamed employee despite Plaintiff having booked the room. But Plaintiff made no mention of discrimination, nor did she otherwise alert Ms. Exline that she believed her lack of access to the room was due to her status as a nursing mother or as an African-American female. Therefore, her retaliation argument fails for lack of any protected activity.

The Third Circuit has held that these types of "general complaint[s] of unfair treatment [are] insufficient to establish protected activity under Title VII" and that "opposition to an illegal employment practice must identify the employer and the practice—if not specifically, at least by context." Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006); see Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 195 (3d Cir. 2016) ("[P]laintiff's 'vague allegations of "civil rights" violations,' without reference to discrimination based on any protected category, did not constitute protected conduct under Title VII." (quoting Slagle, 435 F.3d at 268)); Sanchez v. SunGard Availability Servs. LP, 362 F. App'x 283, 288 (3d Cir. 2010) (nonprecedential) ("[C]omplaints must be specific enough to notify management of the particular type of

discrimination at issue in order to constitute 'protected activity.'" (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995))).

Moreover, even assuming that Plaintiff's complaints constituted protected activity, Plaintiff fails to establish a causal connection between her complaints of the unavailability of the pumping room and her ultimate termination.  Plaintiff's brief does not identify a timeline as to when the generalized complaints were made nor does the proffered evidence raise an inference of retaliatory animus. See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) ("Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" (quoting Farrell v. Planters Lifesavers Co., 106 F.3d 271, 280 (3d Cir. 2007)).

What Plaintiff does allege is that "approximately one (1) month prior to her termination, Plaintiff was even given a performance[-]based raise by the Defendant[], for her good work with the Defendant[], however, she was still terminated." Pl.'s Opp. at 9, ECF No. 46 (citing Winder Dep. at 11:14-24)). When, as here, "temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.

1997). And, although the Court considers "'a broad array of
evidence' in determining whether a sufficient causal link exists
to survive a motion for summary judgment," including
"intervening antagonism or retaliatory animus, inconsistencies
in the employer's articulated reasons for terminating the
employee, or any other evidence in the record sufficient to
support the inference of retaliatory animus," LeBoon, 503 F.3d
at 232-33 (quoting Farrell, 106 F.3d at 279-81, 284), "[t]he
mere existence of a scintilla of evidence in support of the
plaintiff's position will be insufficient; there must be
evidence on which the jury could reasonably find for the
plaintiff." Id. at 233 (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 252 (1986)).  Here, Plaintiff fails to proffer a
causal connection between any protected activity and her
ultimate termination.

Because Plaintiff has failed to show either protected
activity or a causal connection between her generalized
complaints and her termination, the Court will grant Defendant's
motion for summary judgment as to the retaliation claim.

C. Hostile Work Environment

To prevail on a claim of hostile work environment, a plaintiff
must show: (1) she "suffered intentional discrimination" because
of her membership in a protected class; (2) "the discrimination
was severe or pervasive"; (3) the "discrimination detrimentally

affected the plaintiff"; (4) "the discrimination would
detrimentally affect a reasonable person in like circumstances";
and (5) the "existence of <u>respondeat superior</u> liability." <u>Mandel
v. M & Q Packaging Corp.</u>, 706 F.3d 157, 167 (3d Cir. 2013)
(citations omitted). Here, Defendant challenges the first four
elements.

As to the first element, as discussed above, Plaintiff has
stated a prima facie case of intentional pregnancy- and race-
based discrimination. As to the second element, courts look to
the totality of the circumstances in deciding whether the
complained-of discrimination was "severe or pervasive," by
looking at "the frequency of the discriminatory conduct; its
severity; whether it is physically threatening or humiliating,
or a mere offensive utterance; and whether it unreasonably
interferes with an employee's work performance." <u>Id.</u> at 168
(quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993)).
"When the workplace is permeated with 'discriminatory
intimidation, ridicule, and insult,' that is 'sufficiently
severe or pervasive to alter the conditions of the victim's
employment and create an abusive working environment.' Title VII
is violated." <u>Harris</u>, 510 U.S. at 21 (quoting <u>Meritor Sav. Bank,
FSB v. Vinson</u>, 477 U.S. 57, 65, 67 (1986)).

Plaintiff alleges that on one occasion, when she attempted to
use the designated pumping room "two (2) men were in the room,

and when Plaintiff informed them that she needed the room 'to pump', one of them asked her 'to pump what', and then looked at the Plaintiff's breasts, and said 'oh, okay.'" Pl.'s Opp. at 21, ECF No. 46 (quoting Winder Dep. at 38:11-19)). On another occasion, when Plaintiff complained to her supervisors that she was unable to pump in the designated room because the room was already reserved in the electronic scheduling system, Plaintiff was told that she should "use the closet or bathroom." Winder Dep. at 31:9-20.

    As a result of being denied access to the designated pumping room (despite Ms. Lacey being consistently allowed to use the room as needed and during the lunch hour), Plaintiff on one occasion had to pump breast milk in a coworker's car and on another occasion visibly leaked a large amount of breast milk through her shirt. See Pl.'s Opp. at 21, ECF No. 46. Ms. Moatz observed that Plaintiff's shirt was "completely soiled because she could not get in to the room to pump. Her clothes were wet." Moatz Dep. at 39:1-4.

    While undoubtedly embarrassing, a reasonable jury could not find that these circumstances resulted in the type and scope of humiliation which satisfies the severe or pervasive requirement for a hostile work environment claim. Therefore, the Court will grant Defendant's motion for summary judgment on the hostile work environment claim.

D. Punitive Damages

In a Title VII case, "[p]unitive damages are limited . . . to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" Kolstad v. Am. Dental Assoc., 527 U.S. 526, 529–30 (1999). And, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" Id. at 545 (citation omitted).

Plaintiff does not allege which individual's actions she believes constitute malice or reckless indifference. See Pl.'s Opp. at 25, ECF No. 46. And, Plaintiff fails to make any arguments that, even if Ms. Exline or another individual employee acted with malice or reckless indifference, Defendant did not make a good faith effort to comply with Title VII. Defendant points to Ms. Moatz's efforts to help Plaintiff when she leaked through her shirt, and to QMES' efforts to create an electronic scheduling system to better allow all nursing mothers to pump. See Def.'s Mot. for Summ. J. at 25, ECF No. 45. Therefore, the Court will grant Defendant's motion for summary judgment on Plaintiff's claims for punitive damages.

II.  Conclusion

For the foregoing reasons, this Court will grant Defendant's motion for summary judgment on Plaintiff's claim for (1) retaliation, (2) hostile work environment, and (3) punitive damages. The Court will deny Defendant's motion for summary judgment on Plaintiff's claim for pregnancy and racial discrimination.

An appropriate order follows.